This is not the first time that this Court has considered the qualifications of Dr. Carlo Tornatore, who is the Director of the Multiple Sclerosis Clinic at Georgetown University and also the Director of the Neurology Residency Program there. In the Andreu case, this Court said that the Special Master could not re-inject requirements that had been rejected in the Alton case by talking about the credibility of experts. In this case, the case of Lakeisha Isaac, the Special Master tried to bring back requirements rejected in Alton by talking about the reliability of Dr. Tornatore's medical theory. Let's be very clear and let's compare this case with the Alton case. Both cases involved tetanus vaccination. Both cases involved autoimmune neurological injury. Both cases involved petitioner's experts who proposed molecular mimicry as the medical theory. In Alton, the case involved a possible link between tetanus vaccine and central nervous system injury, a sequence hitherto unproven in medicine. In the Lakeisha Isaac case, we are dealing with a possible link between tetanus vaccine and peripheral nervous system injury, also a sequence hitherto unproven in medicine. Well, actually that's not quite true. There has never been a report like Pollard and Selby and there has never been an admission by the Institute of Medicine that tetanus vaccine could cause the injury in the Alton case. That has never happened. With regard to tetanus vaccine causing Guillain-Barré syndrome, the Institute of Medicine did find that the evidence favored a causal relationship. That was their statement for many, many years. It was based on a single medical article. That article has not changed. The facts of that article have not changed, but the Institute of Medicine's interpretation of that article has changed. They now say that it's no longer evidence that supports a causal relationship, but now there's not enough evidence to say one way or the other. Most of the cases in the Vaccine Injury Compensation Program fall into that category. If you have an injury where the Institute of Medicine says the evidence supports a causal connection, that injury should be, or usually is, moved to a table and it becomes a table injury. Today, 90% of the cases in the vaccine program are not table injuries. When the program first started many years ago, and I've been involved since the beginning, 90% of the cases were table injury cases. The table was changed in 1995 by the Secretary. Today, over 90% of the cases are not table injuries. They're causation-in-fact cases. Is that 90% of the claims, or 90% of the cases of disputed cases, Your Honor? Right, because the table cases are much less likely to go to litigation. We rarely find table cases, Your Honor. They aren't. Most of the new vaccines that are added to the table, for instance, are added with no injuries. So, a Gardasil vaccine, or an influenza vaccine, or any of these vaccines that are subsequently added to the table list no injuries. They may list anaphylaxis within a few hours of vaccination, but no other injuries are listed. So, most of what we do in this program involves non-table cases, proving causation-in-fact. And the Court, in often, made it very clear what's required. What is required is a medical theory of causation, a logical sequence of cause and effect, and the appropriate temporal relationship. Those three things. Can you just help me on something? Yes, sir. Explain to me the difference between one and two. I've had a hard time understanding that myself, but I think what I can say is that... Is one about generality, and the other is on the specific facts, or... I think that's right, Your Honor. I think that, number one, is a medical theory stating how the vaccine could cause the injury. So that's the theory. Number two, the logical sequence of cause and effect means that the facts of the case have to fit that theory. And the Court has sometimes said that you can combine one and three to get two. In other words, if you have a medical theory, and you have a striking temporal relationship, which we do in this case, the Court has said, I believe it was in Capizano, or maybe one of the other cases that we cited, that you can combine one and three to get to two. Two is clearly not a problem in this case, because here we have Lakeisha Isaac, who had no problems before the vaccination, healthy individual, gets the vaccination, and within a couple of weeks, she develops Guillain-Barre syndrome. So the timing is striking, the logical sequence of cause and effect fits the medical theory of molecular mimicry. The theory of molecular mimicry is basically that, and Dr. Tornatoy described that in detail, and we pointed that out in the brief, he described it as a situation where some component of the vaccine, and we rarely know what that component is, some component of the vaccine is similar enough to the peripheral nerve myelin that myelinates our nerves, so that the immune system becomes tripped, it becomes misdirected, instead of attacking the foreign antigen, it becomes misdirected and attacks self. So in the case of Guillain-Barre syndrome, it's kind of like an electrical cord. The myelin is the insulation on the peripheral nerves, and the autoimmune attack on that myelin picks holes in it, to the point that it shorts out, and when it shorts out, it can either be motor nerves, which causes weakness, or sensory nerves, which causes tingling, numbness, that type of thing. The government had its own expert witness in this case, right? Yes, Dr. Leist. And is the special master permitted to weigh the credibility of the testimony of the witnesses, as well as weigh the relative persuasiveness of the evidence in the record? Under ANDREO, the word credibility to use, the answer is no. The ANDREO court said very specifically, when you're talking about highly qualified experts, and both of these gentlemen are highly qualified experts, there's no issue of credibility. Credibility is fact witnesses. Do you believe what they say about the facts? Well then, persuasiveness. I think the word is reliability. In this case, the court is not using credibility, they're using the word reliability. And the reliability is not directed toward Dr. Tornatore, or toward Dr. Leist, the reliability has to be directed toward the medical theory. So let's talk about the medical theory. Is it a reliable medical theory? Dr. Leist, their expert, admitted that this theory has been accepted for over 100 years. The animal model demonstrates that it's a... You're talking about the more basic molecular mimicry theory. Correct. Not as it relates here, between the syndrome and the injury. No, let me explain why. That's the heart of the matter right there. You've asked the question, it's the heart of the matter. Let's go back and talk about some of the cases that Dr. Tornatore used as examples of molecular mimicry. One of those cases was, he said, in the case of Campylobacter dejuni, which is a gastrointestinal virus, they have actually, scientists have actually identified what it is in that virus that may cross-react with something in the peripheral nervous system causing Guillain-Barré syndrome. That's one of the only cases in the world where we've identified homology for Guillain-Barré syndrome. He also talked about the Schoenberg article, which talked about swine flu vaccine back in 1976, and I was involved in that and tried cases all over the country of that. Back then, the epidemiology was overwhelming that swine flu vaccine caused Guillain-Barré syndrome. As a matter of fact, if you developed Guillain-Barré syndrome within three weeks of swine flu vaccination, the likelihood was 90% that the vaccine caused it. The relative risk was 10 in the epidemiological studies. That meant a few items. Ten people up in a room, all of whom had Guillain-Barré syndrome three weeks after the vaccination, nine of those were caused by the vaccine, one may have occurred by chance alone. That's overwhelming scientific certainty. To this day, we do not know what the specific antigen is in the swine flu vaccine that had homology with the peripheral nervous system myelin. We still don't know that. We don't know that for most of the autoimmune cases that we deal with. If we have to prove homology, which is what the special master was really requiring, if we have to prove which specific little piece of the vaccine cross-reacted with the myelin and the peripheral nerve, then we can't win any of these cases. We would have to hire a scientist to do all kinds of tests. Let me see if I can sum up your case. Your case is that we need to reverse here because the special master committed legal error. Exactly. Requiring you to prove homology. Requiring us to show evidence. She was requiring scientific evidence of scientific proof. Scientific proof is different than legal proof. We all know that. Where did she say this? She talked a lot about his science-based opinion and so forth. What she did was she said that because one of the things he mentioned was the Pollard and Selvey article, which the IOM had said for years favored a causal relationship between tetanus vaccine and GBS. For years, we'd operate under the assumption that tetanus vaccine can cause GBS. We know this because of the Pollard and Selvey article. Let me explain that article very quickly. A man came in to see Dr. Pollard. He had developed Guillain-Barre syndrome three weeks after a tetanus vaccination. In taking the history, the doctor noticed that 10 years previously, when the guy had gotten his tetanus vaccine at that point, he developed Guillain-Barre syndrome after it too. Well, they didn't learn because 10 years later, the guy got another tetanus vaccine and got Guillain-Barre syndrome the third time. Then he went on to subsequently have a relapsing and re-bitting course, and so a lot of things would provoke his... By that time, his nerves are shot. He's had three pieces of Guillain-Barre all following tetanus vaccine. This is tremendous evidence. It's called challenge-re-challenge evidence. If you give a drug, a person has a reaction, you withdraw it, the person gets better. Even in the Pollard study, the authors didn't rule out other possible causes. No, and we can't. We can't in this case, but that's not our burden. The burden, once we put on a... You don't have to rule out all possible causes, but you do have to show that causal connection. You do have to show that there's a relationship. Well, no question there was a relationship between the guy getting the tetanus vaccine and developing GBS. That relationship hasn't changed. What they said, what the doctors said, is that, well, we didn't do every possible test to rule out every possible virus, but let me point out that the government, what we put to say, that many virus illnesses can cause Guillain-Barre syndrome, but they don't know the homology in any of those either. The only one we know the homology for is Campylobacter jejuni. Okay, you're into your rebuttal time. Thank you. Counselor Watts? Yes. May it please the court. The decisions below are rich with citation two and correct application of this court's precedent. It is clear from petitioner's case here today that her true complaint lies with the special master's evaluation and weighing of the evidence. Matters uniquely within the purview of the fact finder. However, because the special master considered the relevant evidence, stated and applied the correct legal standard, and articulated a rational basis for her findings, we ask you to decline petitioner's invitation to re-litigate her claim in this forum. Well, at the heart of their case is, because of all of that, of several layers of deference to the special master, is an argument about what the relevant legal standard is for causation. And their argument, as I understand it, putting aside the high credentials of their expert, which is not a substitute for the soundness of the theory, that the theory is sufficiently sound in this regime because there was the Pollard article, and even though the Institute of Medicine has walked away from making an affirmative inference based on that article, there really isn't anything to put on the other side, and that's enough. Something like that. None of which questions what the special master found, I think, if indeed that is enough. So why is that not legally enough in this regime? In this case, petitioner was required to show a causal relationship between the tetanus vaccine specifically, and her GBS, positing the theory of molecular mimicry in a very general sense, doesn't make the specificity of the specific vaccine to her injury. I mean, the court stated immoberly that general theories, generic theories that have no relationship to the vaccine at issue or the injury alleged are insufficient. And here, it's not just that the Institute of Medicine went back in 2011 and reexamined the evidence concerning tetanus toxoid containing vaccines and GBS, and reclassified that case basically as a case of CIDP and not GBS. But how different are those two things, the CIBT and GBS? I know that, I mean, I know, I guess it's too strong, tell me if I'm wrong, that they didn't put on evidence that, in fact, that distinction is a distinction without a difference. No, actually, the Institute of Medicine discusses CIDP as a different clinical entity within the report. They separate that out. I understand that. So my question is, how are those things actually different, or how different are they? Either question. We believe that they're distinct clinical entities, and there's no per se relationship between causal theories and vaccine causation. We don't believe that there is any evidence that tetanus vaccine, for example, can cause CIDP either. Really, this case boils down to the special master requiring indicia of reliability for petitioner's expert's opinion. Dr. Tornatore offered his conclusory opinion that tetanus vaccine is known to cause GBS. He cited the two pieces of evidence to support that, and she was not required, but allowed to investigate the soundness of the reasons supporting his opinion. Well, let me ask you a hypothetical. What if, let's rewind back and say we were all here in this room in 2008, and so the 2004 IOM study was still out there. In the government's view, would that be enough of a causal connection? Would that establish a causal connection? Not at all. In fact, we defended this case all along on Allison's prong one, that there wasn't a sufficient causal connection. Dr. Leist, our expert, I think he's evidence- Well, then what is needed then? In the government's view, where's the tipping point? You had a study, the Pollard study. You had the Institute of Medicine proclaiming that, yes, in their estimation on the strength of that study, there's causation between the syndrome and the vaccine. What more do you expect? Well, every case is adjudicated on its merits, and the reliability of an expert's opinion in any given case is going to vary depending on the facts of the case. The expert witness- Okay, but you had the Institute of Medicine's report in 2004, and it hadn't been walked back in 2011 yet, because for purposes of this hypothetical, it's 2008 today. Why isn't that good enough? In 2008, a special master might have taken a look at this case, and that evidence, in fact, that that was sufficient to meet health in prong one, but we won't know that. There might be other factors in a case that would allow a fact finder to consider that evidence, but not find it preponderant, not find that the totality of the circumstances and facts of the case rose to a preponderant level, more likely than not, that the vaccine at issue in that case actually caused the person's condition. It's worth noting that, in this case, the special master spent quite a bit of time discussing the reliability of Dr. Tornatore's opinion under health in prong one, but she also determined that Petitioner had failed to meet her burden under health in prong two. So it wasn't simply- Well, this is maybe, I guess, a version of the same question I asked your friend on the other side. What is the additional, or the alteration of focus when you move from one to two? I must find, I'd say I find this, whatever this logical sequence language, and often too, not transparently clear. I think you hit upon it earlier, and the difference between the two factors, as it were, is the distinction between can a vaccine cause the injury alleged, and did it cause the injury  You don't have to prove that it did. And the special master, in her decision, said, unbalance the gap between what is known and what is hypothesized by the Petitioner's expert is too large to constitute a reliable theory. Goes on and says, he did so by asserting a possible analogy between the vaccine and the unrelated bacterium that actually has not been shown to produce the form of GBS from which Petitioner suffers. That appears to me to be saying that Petitioner had to do more than just show a reliable medical theory, that Petitioner had to prove the theory. No, I think that what the special master was referring to is the lack of supporting evidence for the specific opinion here that tetanus vaccine causes GBS, which he was referring to- At that point, why isn't the Pollard study enough to give support to a reliable theory? Well, in large part, because the Pollard and Selby article no longer stands for the proposition that challenge, re-challenge applies to tetanus vaccine and GBS, a specific injury at issue. And number two, because it was undisputed in this case that the Petitioner here had the form of GBS-AIDP as opposed to the axonal form of GBS, which Dr. Tornatore talked about. It has been shown in animal models that the specific bacterium, Seizure Juni, which usually causes gastrointestinal symptoms such as diarrhea, in animal models has been shown to have homology and to cause GBS. It hasn't been established in humans, I don't think, but I think she was distinguishing that Dr. Tornatore was trying to prove his case through analogy. She didn't require medical literature per se, but I think when you look at what was offered in this case, it's Dr.- Isn't, when we say a reliable medical theory, I mean, doesn't that infer an analogy at some logic to get to a certain result? It could, but Special Master, I think she was pointing out that it wasn't her job to fill in Dr. Tornatore's gaps. For example, showing that the swine flu vaccine in the late 70s caused GBS and then expecting her to say that because that vaccine caused GBS, every other vaccine, including the tetanus vaccine, is equally plausible, it's not her job to fill in those gaps. It was Dr. Tornatore's. And it's worth noting that aside from Pollard and Selby and the 1994 version of the Institute of Medicine, he offered no other evidence. And that's just not medical literature, that's his own experience. What is the kind of evidence that, though missing here, might support a finding, I guess, on the can-cause component of the inquiry? It's hard to say because without the evidence being there, it's hard to imagine what it would be. It could be case reports, it could be a number of things relating to the expert's testimony. In footnote 33 in the special master's decision, she lists three cases that she had. They were involving different vaccines and different injuries, mind you. But there were three cases in which the petitioner prevailed on a theory of molecular mimicry. But in each of those cases, she found that the totality of the evidence, including the expert's opinion in that case, how they supported that opinion. So how? Give some details. What's the kind of support that was provided there that is missing here? Some evidence of molecular similarity, or some epidemiological evidence, or stronger case reports where there's no suggestion of an alternative cause? I'm just speculating here. I believe in one of her decisions, the expert had shown several articles, not just case reports, but he had established at least that molecular mimicry could have been at work in that petitioner's case based on things like clinical signs and things that he brought in from the articles. So I know we're at the level of the science here, but what is evidence of molecular mimicry that is short of actually establishing the structure of the molecules and their similarity to each other? Perhaps the establishment of immune symptoms compatible with our objective signs of immune activation that's compatible with that theory. That could be one of them. It's worth noting that in the WC case, which was affirmed by this court, the special master in that case had rejected Dr. Tornatore's theory of molecular mimicry. In that case, Dr. Tornatore had posited that molecular mimicry could explain how the flu vaccine in that case significantly aggravated that claimant's multiple sclerosis. What Dr. Tornatore failed to do was to provide evidence that the portions of the flu virus that were shown to be compatible with myelin-basin protein were actually present in the flu vaccine the petitioner received. Because Dr. Tornatore could not establish that molecular mimicry was at work in that case, regardless of the antigen, the special master rejected his molecular mimicry theory in that case as being unreliable as to the vaccine and the injury at issue. That decision was affirmed by this court. There are cases out there where special masters have found that there is, and like the special master here, she said there is some balance between the evidence she had here and the higher standards of scientific certainty. What she wanted was something in the middle, at least, to show that molecular mimicry was applicable, the theory was applicable to tetanus vaccine causing JBS. She stated repeatedly that she not only understood the difference between the scientific standard and the preponderance more likely than not standard in the vaccine program, but that she wasn't requiring scientific evidence. But she needed something more. She was entitled to not rely on Dr. Tornatore's conclusory opinion. She was entitled to look at the evidence he said supported his opinion, and she did. And the approach to judging the reliability of the scientific expert's testimony is the same as, different from 702 Daubert standards, or what? Well, Vaccine Rule 8 requires the special masters to consider reliable and relevant evidence. And so that is, that has a flavor of the Daubert factors. And the Daubert factors obviously have been approved by use of a special master to determine the reliability of an expert's opinion. Whereas it differs from Daubert generally, is that evidence in the vaccine program is almost always admitted. And the Daubert factors are used to assess the reliability of the opinion offered by the expert, including the foundation of their opinion. If an expert gives a conclusion, what did they rely on? And once you look at that evidence, and the evidence is very weak, as it is in this case, the special master's decision is well supported in this record. Okay, thank you, Ms. White. Thank you. I'll try to be brief. One of the things that counsel talked about was the fact that you might be able to have evidence from case reports. One of the things the vaccine compensation program has done is to basically eliminate case reports from medical literature. Because what happens with a case like this, for instance, the doctor no longer writes a case report. He sends a thing into the vaccine adverse event reporting system. There are plenty of cases in the vaccine adverse event reporting system of tetanus, Guillain-Barre syndrome, following tetanus vaccination. They just don't get written up in the literature anymore. But your expert didn't rely on them. No, it doesn't have to, because we're not required to use medical articles or epidemiology. Those are not required. The Daubert that you talked about is very important, because in Daubert, the issue is whether his methodology was sound. His methodology was clearly sound, because even Dr. Leist admitted that the molecular mimicry theory is a valid medical theory. There's nothing wrong with the theory. The Alton Court accepted molecular mimicry for tetanus vaccine causing a central nervous system disorder, autoimmune disorder, without any literature, without any epidemiology, without the Institute of Medicine saying anything. It's not required. The fact that the Institute of Medicine redefined simply tells us that there's a redefinition. And that gets to the point you were raising about CIDP. Isn't that the same thing? It was the same thing. Am I right that... You're absolutely right. No, no. I wasn't making an assertion. I'm not qualified to make an assertion. I was about to finish with a procedural point, that you were given the opportunity by the special master to address, I guess, what was then the preliminary 2011 Institute of Medicine report. And you did not submit anything that said, among other things, for example, the reclassification of the syndrome in the Pollard article really doesn't make any difference. That syndrome is almost homologous to GBS. Just a point of fact, we did not handle, my firm did not handle the trial. We took over on the appeal. I just want to make sure that's clear. We took over at the appeal, the motion for review that went up. I don't know what evidence was presented. I don't recall seeing any evidence of that fact. But to get back to what you were saying about AIDCP and CIDP, those terms came up back during the swine flu program when then-Secretary Califano decided that anybody who could show they had Guillain-Barre syndrome after swine flu vaccine wouldn't have to prove a theory of liability. Many of those cases were chronic relapsing cases. At that time, Dr. Arnes and the famous two-volume Peter Dick textbook defined those as GBS and chronic GBS. So it's always been GBS and chronic GBS. Because of that program, that definition by Secretary Califano, the next textbook came out with the definition of AIDP for acute GBS and CIDP for chronic GBS. But Pollard and Selby was not a chronic GBS case until after his third acute bout of Guillain-Barre syndrome after tetanus vaccine. To have three episodes of acute GBS, each one following a tetanus vaccine. I don't care what the Institute of Medicine says about that. That is dynamite proof. And the fact that he went on subsequently to have chronic relapsing course can hardly be surprising. We know that from the animal model, the same antigens injected into one animal can produce the acute disease, whereas another animal with a different genetic makeup will have a chronic relapsing course. So whether you have an acute reaction or a chronic reaction is dependent upon your genes. It's dependent upon the status of your immune system at the time you're vaccinated. And let me be clear, we're not saying vaccines are the only cause of GBS. They're a rare cause of GBS. GBS can be triggered by all kinds of viruses, by surgery, by vaccinations, all kinds of vaccinations. And the only one I pointed out where we have this homology, this exact evidence, this biological marker to be able to say there's something in this that is similar enough to the peripheral nervous system island to be able to say there's homology, the only place that exists is in what Dr. Tornatore pointed out, Campylobacter jejuni. He also used the Schoenberg article to point out the fact that in a case where we knew for certain that the vaccine caused the Guillain-Barre syndrome, we still don't know the homology today, but we know it caused it, and everybody speculates that it's probably molecular mimicry. Okay, thank you, Mr. Shimmer. Thank you. That concludes our hearing for today. This court is adjourned.